IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


DION CARTER,
      4058 First Street, S.W.
      Washington, D.C. 20032,

         Plaintiff,

                          No. 1:22-cv-01681
v.

DISTRICT OF COLUMBIA,
Serve:
      Hon. Muriel Bowser, Mayor
      Wilson Building                    **Jury trial demanded**
      1250 Pennsylvania Avenue, N.W.
      Washington, D.C. 20005
--and--
      Hon. Karl Racine, Attorney General
      441 4th Street, N.W., Suite 1100
      Washington, D.C. 20001

         Defendant.

## COMPLAINT

### *Introduction*

1.    This civil rights suit under 42 U.S.C. § 1983 challenges the June 13, 2019, firing of Dion Carter, a building maintenance technician at the District of Columbia Courts, and the pattern of workplace mistreatment and abuse that preceded it, on a false pretext for the discriminatory and retaliatory animus of his supervisors on account of his status, first as a black lesbian, then as a black transgender man. Mr. Carter claims that his termination violated his rights to equal protection and due process under the Fifth Amendment to the federal Constitution as guaranteed by judicial decision, *see Bulluck v. Washington,* 468 F.2d 1096, 1100 n.

9 (D.C. Cir. 1972), specifically his rights against discrimination based on sexual orientation, gender identity and expression, and against retaliation for opposing such discrimination.

*Parties, jurisdiction, and preliminary allegations*

2.    Plaintiff Dion Carter ("Mr. Carter," "Carter" or "he")[1] is a citizen and resident of the District of Columbia. He is an African American and a transgender man. His original birth certificate says he was born female in 1970 with the given name "Dionne." Carter lived as a woman and a lesbian until his middle years, bore two children as a woman and raised them to adulthood, but knew from an early age that he was emotionally and psychologically male. His female-to-male transition began in 2015 while he was working at the D.C. Courts; continued both before and after his June 13, 2019, termination from that employment complained of in this Complaint; and was completed in 2021.

3.    Mr. Carter's transition included a multi-year course of medical treatment, including major sex-reassignment surgeries. In June 2016 he had his first surgery, commonly called "chest surgery" or "top surgery," in his case a double mastectomy, and in or about October 2017 he had his second surgery, a complete hysterectomy. On March 8, 2019, he had the first of three major surgical procedures in what is known as "bottom surgery," meaning the first phase of female-to-male genital reconstruction. On October 8, 2020, he underwent the second procedure in that series. And in 2021 he had one further surgical procedure, at which point his anatomical sex reassignment was complete.

4.    Defendant District of Columbia is the entity that stands in for the D.C. Courts, Mr. Carter's former employer. The D.C. Courts are funded by Congress. They are an entity separate from the rest of the D.C. government and beyond its control, and their liability for

---

[1] This Complaint generally refers to the plaintiff as "he," even for periods of his life before he began transitioning from female to male, in accordance with Mr. Carter's preferred usage.

monetary damages will not be funded by the D.C. government, but they are nevertheless treated in this Complaint as not suable as an independent entity under the reasoning of *Bean v. D.C. Courts*, 930 F. Supp. 2d 93, 95 (D.D.C. 2013) ("the District of Columbia Courts cannot be sued separately from the District of Columbia"), and *Kundrat v. District of Columbia,* 106 F. Supp. 2d 1, 4–8 (D.D.C. 2000) (D.C. Courts defendants were "*non sui juris*").

5.      Although funded exclusively by Congress, the D.C. Courts have the character of an independent state court system as understood in *Thompson v. United States*, 548 F.2d 1031 (D.C. Cir. 1976), and as such are non-federal governmental actors for purposes of 42 U.S.C. § 1983. Under the D.C. Court Reform and Civil Procedure Act of 1970, Pub. L. 91-358, title I, 84 Stat. 508 (July 29, 1970), *codified at* D.C. Code § 11-1701(a), they are administered by a Joint Committee on Judicial Administration ("JCJA"), composed of the chief Superior Court and Court of Appeals judges and other jurists from each court, with the court system's executive officer as secretary and chief of operations, and they claim a commitment to "compliance with Federal and local statutes prohibiting discrimination in employment[.]" District of Columbia Courts, Human Resources Information, *available at* https://www.dccourts.gov/about/learn-more/human-resources (last visited May 15, 2022).

6.      This Court has subject matter jurisdiction over the claims in this case under 42 U.S.C. § 1983, which provides a judicial forum for challenges by individuals to violations of their federal constitutional rights under color of state or District of Columbia law.

7.      This suit is filed within three years of the termination alleged herein to be unlawful, in accordance with the limitations provision of D.C. Code § 12-301(a)(8) (three-year general tort statute) and the holding of *Earle v. District of Columbia,* 707 F.3d 299, 305 (D.C. Cir. 2012) (applying the D.C. three-year personal injury limitations period in a Section 1983 action brought in the District).

8.      As a civil rights action under 42 U.S.C. § 1983, this case is exempt from any requirement of exhaustion of administrative remedies under *Patsy v. Board of Regents,* 457 U.S. 496, 516 (1982).

9.      As a civil rights action under 42 U.S.C. § 1983, this suit is exempt from the notice-of-claim requirement for suits for unliquidated damages against the District of Columbia, D.C. Code § 12-309(b), under the reasoning of *Johnson-El v. District of Columbia*, 579 A.2d 163, 170 (D.C. 1990).

10.     Although another suit on the facts alleged herein, under the D.C. Courts' personnel policies rather than under Section 1983, is currently pending on appeal before the D.C. Court of Appeals. *Carter v. District of Columbia*, No. 21-CV-93, this suit is not subject to the restrictions on claim-splitting, defined in *Clayton v. District of Columbia*, 36 F. Supp. 3d 91, 94 (D.D.C. 2014), as "maintain[ing] two actions on the same subject in the same court, against the same defendant at the same time."

*Facts*

11.     Dion Carter began employment as a building maintenance engineer with the D.C. Courts in January 2010. When Carter was hired, presenting as a woman, Carter already had 15 years of experience in building maintenance and technology, in particular heating, ventilation and air conditioning ("HVAC").

12.     Carter was hired at the D.C. Courts by then-chief building engineer Michael Stewart. Carter interviewed twice, first with Mr. Stewart and Mary Ann Satterthwaite, along with a third person, and later with Joe Sanchez, then head of facilities and capital projects (the post later held by Dana Friend).

13.     At the time of hire, Carter was the only female building maintenance engineer at the D.C. Courts.

14.     Under Stewart, at the time of Carter's hire, was Emanuel Allen, building maintenance foreman. From the time Carter arrived in 2010, Allen spoke hardly a word to him. He assigned Carter no work at all. Carter reported daily to work only to spend entire shifts in the break room with nothing to do for weeks on end.

15.     Whenever Carter tried to take the initiative to do work that needed to be done, and Mr. Allen found out about it, he would get angry, saying words to the effect of, "I didn't tell you to do that—you listen to me!" Carter did not know at the time why Allen behaved so callously and often cruelly toward him. Carter made no secret of the fact that he was a lesbian and was in a long-term relationship with a woman.

16.     About six months after he came to the Courts, Carter took the exam to get a Class 6 steamfitter's license, and did not pass the exam. Carter let Allen know this, and asked if he would permit Carter nevertheless to take the "8A" refrigeration license exam, since HVAC was Carter's professional specialty and the reason he had been hired. Allen responded angrily, "No! You need to take the 6!"

17.     Carter then went to see Stewart. When Stewart heard that Allen had denied Carter permission to sit for the "8A" license exam, he had some choice words in disparagement of Mr. Allen, and pointed out that Allen holds an "8A" license himself and may not have wanted Carter to have one.

18.     Around May 2010, Stewart let building maintenance employees know by e-mail that performance evaluations were coming. Carter went to see Stewart about this, and asked him what Carter could be evaluated on since Carter had done virtually no work since coming on board.

19.     Mr. Stewart was completely surprised. He had no idea that Carter had been kept from working. He instructed Carter, "Don't worry about [Allen]," and said Carter was to report directly to him, Stewart, from then on.

20.     Mr. Stewart then had a meeting with all the maintenance workers and told them to treat Carter with the same respect they accorded one another, and admonished them that Carter's sexual orientation was none of their business.

21.     Stewart then assigned Carter away from Allen and out of the Moultrie Building (500 Indiana Avenue, N.W.), specifically to the D.C. Courts' "A" and "B" Buildings (515 5th Street, N.W., and 510 4th Street, N.W., respectively), reporting directly to Stewart.

22.     Allen still would not talk directly to Carter. During work assignments, Allen would call the cell phone of Calvin Bellamy, who often worked with Carter as a helper (he ranked below Carter, paid at Grade 8 while Carter was a Grade 9), and would give Bellamy the relevant information or instructions. Bellamy would place his cell phone on speaker, so that he and Carter could both hear it and could execute the instructions together. Eventually Allen was forced to realize that Carter was quite competent.

23.     In 2015, with the full support and encouragement of his female spouse, Mr. Carter made the extremely difficult decision to begin the female-to-male gender transition of which he had dreamed for most of his life. He started the long pre-transition counseling process through Kaiser Permanente, his health care provider, where beginning in August 2015 he met regularly with Emily Pitt, LICSW, a psychotherapist specializing in gender identity and transition issues.

24.     In or about July 2015, Mr. Stewart suddenly retired. Building maintenance workers under his supervision returned from the July 4th holiday that year to letters in their lockers announcing that he had left.

25.     That weekend, Mr. Allen took over Mr. Stewart's duties. After the change of leadership, Mr. Carter's treatment at the workplace grew notably worse.

26.     The first task to be performed after Mr. Allen became acting chief building engineer was a large lighting maintenance project. Mr. Allen divided a group of workers into two teams. One was composed of Armando Baltodano, Calvin Bellamy, and Michael Pearson, a licensed electrician who had started at the D.C. Courts about a month before Mr. Stewart left. This team was to change light bulbs in working light fixtures.

27.     The other team was composed of Carter, Jeff Hawkins, Erwin Hicks, and Elnardo Hicks (no family relation to Erwin), and was to be sent to the courthouse detention sallyport and the garage to change light fixtures that were inoperative.

28.     Carter asked Allen why Pearson could not be assigned to the light fixture team, since none of its members were licensed electricians and the job would entail significant rewiring.

29.     Mr. Allen flew into a rage, and threatened Mr. Carter with a poor job evaluation, as he had done before and would do again. "What I say goes," he shouted. He did not change the assignments, which meant that the pending light fixture replacements and their associated rewiring were performed by unlicensed personnel.

30.     In August 2015, Mr. Carter told Mr. Allen that he was beginning a transition from female to male. He explained that once a week he would be meeting with a therapist to help with the transition. At first Mr. Allen seemed to accept the news, and gave the impression that he understood the process.

31.     In January 2016, several months in advance of his first major sex-reassignment surgery, Mr. Carter submitted a formal request for leave under the Family and Medical Leave

Act ("FMLA") for that operation. When Mr. Allen learned of this, his attitude toward Mr. Carter changed immediately and dramatically.

32. For the six months between Carter's FMLA notice and his surgery, Mr. Allen cut Mr. Carter out of all overtime duty, overtime that was mandatory for all building maintenance workers and that they considered desirable.

33. No one else in Mr. Carter's unit was denied overtime. Even Robert Jones, a clerical secretary who did no maintenance work and therefore had been barred from overtime under former chief building engineer Michael Stewart, was given overtime work starting around the time Mr. Carter was first denied it.

34. When Mr. Carter asked Mr. Allen why he had been deleted from the overtime list, Allen gave him no reason whatever, but said he was the boss, he did Carter's evaluations, and he did not have to answer to Carter. He again threatened Carter with a poor performance evaluation if Carter were to question his deletion from the overtime list, so Carter did not further question his decision.

35. Mr. Carter complained of this mistreatment to senior D.C. Courts official Mary Ann Satterthwaite, who met with him and said she would look into the matter, run an overtime report, and investigate. She said Mr. Allen should have directed Mr. Carter immediately to Human Resources for protection and assurance of fair treatment, since Carter's decision to transition placed him in a protected class based on gender identity.

36. At Ms. Satterthwaite's direction, Mr. Carter went to see Dr. Tyrone Jackson, who was then assistant director of the D.C. Courts Human Resources Division. Dr. Jackson explained that Mr. Carter was free to decide whom at the workplace to inform of his transition. He asked Mr. Carter what his preferred name was, and advised him on the

language (*e.g.,* gender pronouns) Mr. Carter was free to ask co-workers to use when addressing or referring to him.

37.     Dr. Jackson added that the D.C. Courts had "nothing in place" in terms of policies to protect transgender employees, and that he would look into what such policies the federal government used that he might borrow.

38.     On June 2, 2016, an "awareness meeting" was held at the workplace, convened by Dr. Jackson, with at least the following D.C. Courts managerial staff present: Dr. Cheryl Bailey, James Vaughan, Emanuel Allen, Joe Sanchez, and then-executive officer Anne Wicks.

39.     At one point during that meeting, Mr. Sanchez leaned over, placed his face uncomfortably close to Mr. Carter's, and said, "Haven't I always treated you fairly?" Ms. Wicks, who was present, apparently discerned something untoward in Mr. Sanchez' question or its manner, or both, and invited Mr. Carter to visit her personally in her office at his convenience.

40.     The next day, June 3, 2016, Mr. Carter met with Ms. Wicks at her invitation. She made it clear that what Mr. Sanchez had done was bullying, and that she was not going to tolerate it; and that if at any time Mr. Carter felt he was being bullied by his superiors, he should come directly to her.

41.     Mr. Carter told Ms. Wicks about Mr. Allen's mistreatment as described in this Complaint. Ms. Wicks indicated she was ready to discipline Mr. Allen immediately for this misconduct, or even to terminate his employment, and asked what Mr. Carter wanted her to do about it. He replied that he would hate for the man to lose his job.

42.     Mr. Carter is unaware whether Ms. Wicks disciplined Mr. Allen thereafter or caused him to be disciplined. Ms. Wicks retired shortly thereafter.

43.     Neither Mary Ann Satterthwaite, nor Dana Friend, nor Tyrone Jackson, nor Anne Wicks, nor Cheryl Bailey ever saw to it that Emanuel Allen was ever disciplined for his behavior toward Mr. Carter, although each of them knew of that behavior in detail.

44.     Mr. Carter went on medical leave on or about June 16, 2016, for his first surgery, came back in August 2016, and began presenting as a man. Soon after that, he began experiencing serious repercussions at the workplace.

45.     Shortly after Mr. Carter came back from surgery in August 2016, Mr. Allen came to him and said, "Let's walk and talk," or words to that effect.

46.     During the ensuing conversation, Mr. Allen emphasized that Mr. Carter was to "stop running up to Gallery Place," meaning making complaints about Mr. Allen's mistreatment of him.

47.     Mr. Allen also said, "I'm not going to have this s***," or words to that effect, and, "If you're going to look the part, be the part," meaning that if Mr. Carter was going to present as a man, he should "be" a man and stop complaining about Mr. Allen to management. He said that otherwise he would "fire both you[r] and Calvin [Bellamy]'s black asses." He said, in an angry tone, "Someday you're going to need me."

48.     Within a few days, Mr. Carter contacted Ms. Satterthwaite and reported this episode. After that, Mr. Allen had no choice but to give Mr. Carter work assignments, particularly because by then people around the Courts' buildings were requesting Mr. Carter by name as their preferred facilities repair person. But Mr. Allen did bring Mr. Carter back to the Moultrie Building, where he worked, evidently to keep him under special scrutiny.

49.     Near the end of 2016, James Vaughan came on duty as chief building engineer. He held a routine initial meeting with Mr. Carter, among the 1-on-1 introductory meetings he was having with every employee under his supervision.

50.    At this initial meeting with Mr. Vaughan, Mr. Carter explained that he and Mr. Allen did not have a good working relationship, and that Mr. Allen bullied him a great deal. Mr. Vaughan was unsympathetic.

51.    After Mr. Carter came back from his second surgery in August 2017, Mr. Allen began a pattern of what Mr. Carter came to call the "he-she" abuse. If someone from outside the Courts was in need of an escort, for instance, Mr. Allen would say, "He-she will take you." This derisive and demeaning name-calling occurred daily. Mr. Vaughan heard Mr. Allen countless times call Mr. Carter "he-she" to his face, or to other people in his presence, and never told Mr. Allen not to do so.

52.    In one example of Mr. Allen's derisive and demeaning abuse, on August 3, 2017, he and Mr. Vaughan ordered Mr. Carter and a co-worker, Alphonso Williams, to go to "A" Building to straighten out a variable air volume unit ("VAV") for the contractors' office there. They were told this needed to be done immediately, that the problem had escalated to the Courts' offices at Gallery Place, and that they were to stay until finished and then report in detail on what they had done.

53.    The job was quite time-consuming, involving many different temperature set points, waiting periods and temperature readings. Mr. Carter had been on site perhaps 15 minutes when Mr. Allen began calling on the telephone, harassing him, asking what he was doing and why it was taking so long.

54.    Mr. Carter reminded Mr. Allen that the work order had come from Gallery Place, and that Mr. Allen had been present when Mr. Williams and Mr. Carter were told to go to "A" Building and do the work. Nevertheless, Mr. Allen kept calling, many more times, and harassing Mr. Carter while he was trying to finish the assignment.

55.    When Mr. Williams and Mr. Carter returned to the Moultrie Building after finishing the job, Mr. Allen berated Mr. Carter savagely in front of Mr. Williams, shouting more or less as follows: "He-she, do what I say! James isn't the boss! I make the decisions! Listen to me! Listen to me again!" Mr. Williams showed intense embarrassment and tried to get Mr. Allen to stop, to no avail.

56.    The very next day, August 4, 2017, Mr. Carter encountered two large steam valves in the Moultrie Building steam plant that were too tight. He knew that one of his co-workers, Elnardo Hicks, had a habit of overtightening them. Because the valves are metal on metal, such overtightening is very dangerous: if the valve stem shears off from overtightening, the steam will jet out under extremely high pressure and can cut a person in half.

57.    Mr. Carter also knew that it was dangerous for unlicensed personnel to tug on those valves to open them. Accordingly, he went to Mr. Vaughan's office to get help from licensed steamfitters. Present in the office when he arrived was Mr. Allen, the working foreman whose duty is to help in such situations. Mr. Carter asked him to add his body strength to the job as a licensed steamfitter.

58.    Mr. Allen sneered that Mr. Carter should deal with the problem without him, saying, "The average *man* can do it." Mr. Vaughn was immediately adjacent to Mr. Allen and said nothing in response to this brazen insult, offered no admonition, request or suggestion that Mr. Allen stop insulting Mr. Carter and offer the help he had requested.

59.    Ultimately it required five workers, taking turns, to get both valves open: Mr. Carter, Erwin Hicks, Jeff Hawkins, Calvin Bellamy, and Armando Baltodano.

60.    That same day, after Mr. Carter and the others finished dealing with the overtightened valves, Mr. Vaughan and Mr. Allen pulled Mr. Carter into their office and took

to berating him once again for needing the help of others with the job. Mr. Carter replied that it had taken four men in addition to himself to free the valves.

61.     Afterward, Mr. Carter e-mailed Mr. Vaughan asking that the topic of valve overtightening and safety be brought up at a regular Friday meeting of the engineers, with the message to keep the top of the valve stem flush with the top of the valve tightening wheel when tightening, and not beneath that level, because tightening beyond that point created the danger that the valve stem would shear off.

62.     Neither Mr. Vaughan nor Mr. Allen raised the topic of overtightened steam valves at subsequent staff meetings, so at one meeting Mr. Carter raised the topic himself. A co-worker, Clyde Elder, agreed, saying more than one person at a time was needed to do the work of opening the valves, after they have been offline for repairs or any other reason, because of the danger.

63.     While Mr. Carter was on medical leave for his second surgery, Dana Friend had begun service as head of facilities, so Mr. Carter requested a meeting with Mr. Friend and Ms. Satterthwaite to try and make Mr. Allen's and Mr. Vaughan's mistreatment stop.

64.     That meeting took place in September 2017. Without telling Mr. Carter, Ms. Satterthwaite and Mr. Friend brought Mr. Vaughan and Mr. Allen to the meeting. Mr. Carter was shocked and appalled at this ambush.

65.     Mr. Carter had requested the meeting to discuss away from Allen and Vaughan their bullying of him. But as soon as the meeting started, everyone took turns berating Mr. Carter, finding fault with him for one thing or another. Either Allen or Vaughan, or both, admonished Carter angrily that he "had better not refuse to do plumbing." That struck Carter as bizarre, since he did plenty of plumbing, and he told them to look at the work orders and see his plumbing work for themselves.

66.     At that meeting Mr. Carter was eventually permitted to speak about Mr. Allen's bullying of him on account of his gender transition. To this Mr. Allen replied, right out in the open, words to the effect of, "I'm from the old school, and where I come from I was brought up to say, 'If it's a black shoe, it's a black shoe.'" By this he meant that if Mr. Carter was formerly a female, he was still a female.

67.     In his assertions described above, Mr. Vaughan laid bare his motive to discriminate against Mr. Carter based on his sexual orientation and gender identity and expression.

68.     Mr. Allen was told by higher management, "You can't speak that way." Mr. Allen was instructed to call Mr. Carter "Mr. Carter," or "Dion," and to use the male pronouns Mr. Carter was now using (he, him, his). Mr. Allen was then ordered to enroll in a class on proper management.

69.     Also at that September 2017 meeting, it was decided that from then on Mr. Carter would report directly to Mr. Vaughan, not to Mr. Allen.

70.     After that September 2017 meeting, electrician Michael Pearson began coming to Mr. Carter, warning him to "watch [his] back" because he had heard Mr. Allen say he wanted to get Mr. Carter's "he-she a** fired."

71.     Not long after that meeting, Mr. Carter asked Ms. Satterthwaite if he could be rescheduled for the night shift so as to avoid Mr. Allen completely. She was sympathetic but declined the request, saying Mr. Carter was too valuable to the Courts and was needed on site during the day.

72.     Later, Mr. Carter asked Mr. Vaughan if he could be moved to the 2 to 10 p.m. shift, which would allow him to avoid Mr. Allen except for a 30-minute overlap. Mr. Vaughan got back to Mr. Carter saying the request had been approved. Mr. Carter wrote Ms. Satterthwaite thanking her for this approval, as he believed it must have come from her. She protested

again, because she had not been told of the change, and because, she said, Mr. Carter was too valuable to lose during the days. Nevertheless Mr. Carter was permitted to begin working the 2 to 10 p.m. shift.

73.     Shortly after Mr. Carter began working 2 to 10, Mr. Vaughan began imposing ridiculous conditions on him, starting with a requirement that he report to Mr. Vaughan in his office for at least 30 minutes every workday without fail.

74.     In his actions and directives as described above, Mr. Vaughan was acting on his own motive to discriminate against Mr. Carter based on his sexual orientation and gender identity and expression.

75.     Mr. Carter recognized that this would mean he was highly likely to have to see Mr. Allen and undergo his bullying and demeaning treatment.

76.     Mr. Carter asked his predecessor engineer on the 2 to 10 p.m. shift, Rodrigo Gobantes, Jr., who was commonly called "JR," whether he had been ordered to report to Mr. Vaughan for 30 minutes every day, and JR said no, of course not.

77.     Mr. Carter then went to Ms. Satterthwaite, who agreed that it was improper for Mr. Vaughan to impose this condition on Mr. Carter alone.

78.     Shortly after that, probably after Ms. Satterthwaite talked to him, Mr. Vaughan announced that everyone would have to report to his supervisor for 30 minutes at the start of every shift. But this new requirement was not enforced as to anyone but Mr. Carter. In his actions and directives as described herein, Mr. Vaughan was acting on his own motive to discriminate against Mr. Carter based on his sexual orientation and gender identity and expression.

79.     As it turned out, Mr. Carter worked the 2-to-10 shift for less than a month, in February and March 2018. During that time the following events took place.

80.     One day during that time, in or about mid-March 2018, Mr. Carter arrived before his 2 p.m. shift started, around 1:30 p.m., as he often did. He did not sign in at first, heeding the admonition not to sign in early. He learned within moments, however, that Jeff Hawkins and Erwin Hicks had a major steam leak in progress. So he signed in and offered to help, because it was plainly the right thing to do. At the time of hire, all building maintenance personnel were told that when they were on the property they were to consider themselves on duty, meaning that at least in case of emergency, they were to assist. In such a case there was no need to call the boss first and see whether the worker should sign in.

81.     However, on this occasion, when Mr. Carter signed out shortly after 10 p.m.— heeding the admonition from Mr. Vaughan that his supervisees were not allowed to claim overtime—Mr. Carter was deemed absent without leave ("AWOL").

82.     As Mr. Carter later learned, Mr. Vaughan and Mr. Allen had tried to get Jeff Hawkins on a 3-way telephone call to say that Mr. Carter had not helped with the steam leak. Mr. Hawkins told them truthfully that indeed Mr. Carter had helped. The next day Mr. Vaughan announced a rule that no worker under his supervision was permitted to assist, even in an emergency, without prior approval of a supervisor.

83.     In their actions and directives as described above, Mr. Vaughan and Mr. Allen were acting on their own motive to discriminate against Mr. Carter based on his sexual orientation and gender identity and expression.

84.     Approximately two weeks after the supposed absence without leave referred to above, Mr. Carter visited Dr. Bailey by appointment to complain that he had been unjustly deemed AWOL. Dr. Bailey almost immediately changed the subject from the AWOL matter, said she was "a licensed therapist," and asked if she could ask him "a few questions." She then inquired briefly about the hormone treatments Mr. Carter was receiving for his transition, and

then opined that because he was taking testosterone he was having "outbursts" and exhibiting "uncontrollable behavior."

85.     Mr. Carter objected that this was not the case, that Dr. Bailey could review internal security videos to see for herself that he had engaged in no "outbursts" or "uncontrollable behavior," that he had asked for the meeting to discuss the unfair AWOL charge, and that Mr. Vaughan had not even used the correct date when he alleged the supposed AWOL. Dr. Bailey refused to address Mr. Carter's factual averments concerning the supposed AWOL and ended the meeting.

86.     In her assertions and actions as described above, Dr. Bailey acted on her own motive to discriminate against Mr. Carter based on his sexual orientation and gender identity and expression.

87.     Mr. Carter found Dr. Bailey's presumptions about his medical treatment to be unfounded, bizarre, demeaning and insulting. He found her attitude shockingly bigoted, particularly for a "licensed therapist" as she had claimed to be, and especially given the scientific consensus that testosterone in the small amounts administered to aid female-to-male gender transitions was nowhere near enough to cause adverse behavioral changes. Moreover, because Dr. Bailey was the D.C. Courts system's executive director, and as such the operating chief of the Courts as an agency and its final decisionmaker in personnel matters, her acts, decisions and pronouncements constituted D.C. Courts policy, a fact which alarmed Mr. Carter all the more.

88.     At another staff meeting, in March 2018, at which Mr. Allen was present but Mr. Vaughan was absent, Mr. Carter spoke about a rule Mr. Vaughan had announced that his workers were now expected to conduct daily preventive maintenance ("PM") of bathrooms, electrical closets, plumbing, and building roofs. Mr. Carter spoke up against the rule, saying

the department was understaffed and its employees were already working three shifts around the clock. He asked how he and his colleagues could be expected to do PM patrolling on top of the maintenance they were already doing, and that it was unfair that they would be given poor evaluations for not doing the impossible.

89.    Jeff Hawkins spoke next, saying, more or less, "Mr. Allen, it's hard to tell you've got our backs, because if you did, all this," meaning the extra preventive maintenance requirement referred to in the preceding paragraph, "would go away." Thereupon the meeting ended.

90.    An hour later, Mr. Carter received a telephone call from Dana Friend. He and Ms. Satterthwaite asked to meet, and suggested a coffee shop. Mr. Carter said he was happy to meet at their offices, and went up to see them.  The conversation that followed was extremely bizarre.

91.    Mr. Friend and Ms. Satterthwaite asked if Mr. Carter was OK. He said yes. They then asked whether he wished to "admit" that something, which they did not identify, was his "fault." He said no, he hadn't done anything wrong, and had no idea what they were talking about. They did not elucidate.

92.    During either this conversation or another one around the same time, Mr. Friend parroted almost verbatim what Dr. Bailey had said to him in March, that his testosterone treatments were causing him to engage in "outbursts" and "uncontrollable behavior." The accusation was false. It was obvious to Mr. Carter, on hearing this, that the immediate source of Mr. Friend's baseless, prejudiced pronouncement about testosterone was Dr. Bailey, and that she had transmitted her false presumptions, based on bigotry and not science, to Mr. Friend as if she were an authority on the subject. Mr. Carter was appalled and deeply offended by Mr. Friend's parroting of Dr. Bailey's transphobic suppositions

93.     Mr. Friend then said that Mr. Vaughan was considering a two-day suspension of Mr. Carter. Mr. Carter asked Mr. Friend immediately, "For the AWOL?", believing that perhaps he and/or Mr. Vaughan were referring to the AWOL dispute mentioned above. Mr. Carter then said that would be unfair, because he had signed in and out that day and had worked a full day.

94.     Mr. Friend gave no answer as to what he was talking about. He simply said that Mr. Carter would be given the rest of the day off to "get yourself together." He also said, "You want your bacon back, right?" Mr. Carter understood this to refer to his pay. Ms. Satterthwaite said she thought taking the rest of that day off would be "a good thing for [Mr. Carter] right now."

95.     Neither Mr. Friend nor Ms. Satterthwaite observed or could possibly have observed whatever workplace interactions, conduct or behavior apparently prompted their assertions alleged in this paragraph. In their assertions and directives as alleged herein, they were acting on and evidencing their own motive to discriminate against Mr. Carter based on his sexual orientation and gender identity and expression.

96.     Mr. Carter left for the day on Mr. Friend's and Ms. Satterthwaite's instruction, in a state of bafflement, still thinking they had been referring to the AWOL dispute mentioned above.

97.     On April 2, 2018, Mr. Carter filed an internal D.C. Courts administrative complaint of bullying. He did not name Mr. Vaughan on the face of the complaint, but told the investigator, Tiffany Adams-Moore, that it was Mr. Vaughan he was accusing.

98.     Mr. Carter gave Ms. Adams-Moore the names of several people he thought she should interview, including, among others, staff electrician Michael Pearson, who he said could attest to Mr. Vaughan's unreasonable job demands of him, and Jeff Hawkins and Erwin Hicks, who he said could attest to personal knowledge of Mr. Vaughan's isolation and

exclusion of him. He also named Alphonso Williams, the contractor who handled the D.C. Courts' building automation, as someone with personal knowledge of Mr. Vaughan's mistreatment of Mr. Carter. None of Mr. Carter's supporting witnesses was interviewed for the investigation except Michael Pearson and Alphonso Williams, although many other people could have attested to Mr. Vaughan's mistreatment of Mr. Carter.

99.    Ms. Adams-Moore later said to Mr. Carter that she had "no doubt" that "something had gone on there," meaning mistreatment of Mr. Carter by Mr. Vaughan, and that she was not closing the case and would keep her "eye on it."

100.    On or about April 25, 2018, Mr. Friend sent Mr. Carter an e-mail notifying him that as of that day his two-day suspension had been made official, and that he was not to come in on April 26 or 27, nor return to work at all until he had met with Katherine Cleary, an employee assistance counselor at the U.S. Department of Health and Human Services. In the notice, Mr. Friend stated, "It is my sincere hope that this formal referral to EAP provides you with support and direction that will assist you in addressing any issues that may impact your continued employment with the Courts." In sending this e-mail Mr. Friend was acting on his own motive to discriminate against Mr. Carter based on his sexual orientation and gender identity and expression, as well as the similar motive of the source of the D.C. Courts' discriminatory policy as explained below.

101.    On information and belief, the content of Mr. Friend's e-mail was approved by Dr. Bailey, and its implicit allegation that Mr. Carter had mental problems was directly sourced in Dr. Bailey's false and bigoted presumptions about female-to-male gender transition and her bogus suppositions, not only not based in science but contrary to it, that Mr. Carter's hormone treatments must be causing, and that therefore he must be exhibiting, whether observed or not, "outbursts" and "uncontrollable behavior." Moreover, because Dr. Bailey (a) was the D.C.

Courts system's acting executive officer, and as such the operating chief of the Courts as an agency and its final decisionmaker in personnel matters, and (b) clothed her benighted suppositions with an air of clinical as well as bureaucratic authority, her acts, decisions and pronouncements constituted D.C. Courts policy and induced her subordinates to follow it.

102. Mr. Carter e-mailed back saying that he had been seeing Ms. Cleary since 2016. Nevertheless, he complied by contacted Ms. Cleary immediately, and made and kept an appointment with her for the following Monday.

103. Ms. Cleary was very perturbed by Mr. Carter's employer's requirement that he see her as a condition of returning to work, since his seeing her was supposed to be completely voluntary and could not be coerced. She also said she was very concerned at the appearance given by the employer's order that she or her program was sharing confidential information on clients with management, which went entirely counter to the principles her office was created to serve. She told Mr. Carter she had reported the matter to her own superiors.

104. Ms. Cleary further advised Mr. Carter that D.C. Courts managers had insisted that she disclose to them the entirety of her treatment records and notes. She said that she had firmly refused, and that she had reported that issue to her own superiors as well.

105. On information and belief, a report from Ms. Cleary was placed in Mr. Carter's D.C. Courts personnel file attesting to his good mental health and to the legitimacy of his complaints of bullying and torment by his managers.

106. The order that Mr. Carter see Ms. Cleary as a condition of returning to work was the direct product of Mr. Vaughan's, Mr. Allen's, Mr. Friend's, and above all Dr. Bailey's desire to depict Mr. Carter as mentally unstable, and to pretend and insinuate that his gender transition was either the cause of this supposed instability, its principal symptom, or both.

107.    In particular, Mr. Carter's superiors indulged a false, medically unfounded, bias-based supposition that he was exhibiting problems with aggressive behavior, and further that these supposed problems were due to his hormone treatments for the transition. In fact Mr. Carter exhibited no such behavior problems, either as a result of his transition treatments or otherwise.

108.    The April 2018 suspension write-up of Mr. Carter included an unfounded complaint that his work cell phone had logged more than the stated limit of 400 minutes per month. Mr. Carter responded that the telephone bill or bills should show that most of his calls were incoming calls from his supervisors, at all hours of the day and night, whether or not he was at the workplace or on call.

109.    In writing and conveying the April 2018 suspension write-up, Mr. Carter's superiors.

110.    While Mr. Carter was on suspension, he received a telephone call from Mr. Friend, who told him for the first time that he had received a complaint from Robert Jones that Mr. Carter had exhibited some sort of threatening behavior. When Carter returned to work, he asked Jones about this. Mr. Jones said he had made no such complaint and had nothing to do with it, and that he himself was upset about Mr. Allen's behavior.

111.    Meanwhile, the D.C. Courts closed Mr. Carter's bullying complaint, on the stated ground of lack of evidence.

112.    Within days of that closing, Mr. Vaughan had a meeting with all staff, at which he said, looking directly at Mr. Carter, that he knew "half the staff don't like [him]."

113.    One morning in December 2018, all staff attended a mandatory training class for D.C. Courts personnel on sexual harassment. James Vaughan sat in on the class Mr. Carter attended. Mr. Carter and a co-worker spoke briefly afterward with the trainer to ask a few questions, and Mr. Vaughan was watching and listening, from a seat very close to them, first

as they talked between themselves about Mr. Allen, and then as they asked questions of the trainer.

114.    After the class, as Erwin Hicks and Mr. Carter were going to lunch, Mr. Vaughan passed them on the sidewalk and gave them an angry look. Mr. Hicks observed to Mr. Carter, "They're trying to get you mad so they can fire you."

115.    A few minutes before that lunch break ended, Mr. Vaughan called Mr. Carter's cell phone and said, "I need you in my office right away, you and Armando, at 1 pm." Mr. Carter and Mr. Baltodano went. Mr. Carter stopped at the restroom first, and by the time he arrived at about 1:05 p.m. Mr. Vaughan was shouting instructions to Mr. Baltodano in an angry tone.

116.    Mr. Baltodano explained that Mr. Vaughan had ordered them to change all the lights in the Court's adult detention cell block that day. Mr. Carter responded that this job is normally done on a Sunday, when the courthouse cell block houses no prisoners. He explained that the Court's new supervising U.S. marshal had already told the building maintenance division that when the cell block is crowded, no work can be done on lights, except perhaps in one cell at a time if prisoners can be moved around. On this occasion Mr. Baltodano had counted more than 60 lights that needed changing.

117.    The job of changing lightbulbs in the courthouse adult detention cellblock is quite involved. Each light bulb is housed in its own cage, which can be opened only with a special tool. The light bulbs are incandescent, and are illuminated at all times, which means they burn out frequently. Replacing large numbers of cell block lights is not a two-man job; it takes a whole team several hours to complete.

118.    Mr. Carter advised Vaughan Mr. Vaughan that the U.S. marshals who provided courthouse security would tell him, if he were to call them, that building maintenance

personnel are not normally authorized even to enter the adult cell block, let alone to perform maintenance work there, during the weekdays.

119.    Enraged, Mr. Vaughan thundered, more than once, "Are you here to work?" and then immediately ordered Mr. Carter to go home. He did not respond to Mr. Carter's explanation that lightbulb maintenance in the courthouse lock-up could not be done on a weekday, nor did he check with the marshals as to whether his order could be followed.

120.    At the time of Mr. Vaughan's angry order, it was already 2 p.m., and Mr. Baltodano was required to quit for the day at 3:30. The order was impossible for him and Mr. Carter to carry out for that reason as well.

121.    In connection with that suspension, Robert Jones and Armando Baltodano both wrote statements saying that Mr. Vaughan, and not Mr. Carter, was the aggressor in that episode.

122.    Nevertheless, unbeknownst to Mr. Carter, Mr. Vaughan wrote up a proposed suspension of Mr. Carter for 10 days for "insubordination."

123.    Also unbeknownst to Mr. Carter at the time, Mr. Friend reduced the proposed suspension to five days, but did not attempt to intervene in any other way, nor did he question Mr. Vaughan's account of events or his proposed sanction, or counsel, warn, reprimand or otherwise discipline Mr. Vaughan in any way.

124.    Mr. Friend knew or should reasonably have known that the proposed suspension was unwarranted, that Mr. Vaughan's account of events was unworthy of belief, and that Mr. Vaughan was motivated by bias against Mr. Carter based on sexual orientation and gender identity and expression, and should never have accepted the letter as evidence of behavior by Mr. Carter warranting disciplinary action of any kind.

125. Right after the lightbulb episode came the federal government's December 2018-January 2019 partial shutdown and furlough of employees, which dramatically affected the D.C. Courts.

126. Immediately on Mr. Carter's return to work after the furlough ended, Mr. Vaughan e-mailed him a notification that he was being placed on the night shift, 10 p.m. to 6 a.m., starting that Sunday.

127. Mr. Carter went to Mr. Vaughan and said the on-call sheet did not show that would be Mr. Carter's new shift, and pointed out that applicable work rules say that personnel are entitled to know about shift changes in advance to allow them to plan their daily lives accordingly. Mr. Vaughan thundered, "Are you disobeying the director? Come and get that on-call phone now!" Mr. Carter stood up to him, saying it was unfair for Mr. Vaughan to be changing the rules simply when he felt like it.

128. The next day, Mr. Vaughan tried to twist what he had said, by claiming he had not ordered Mr. Carter onto the night shift, but merely the evening shift (from 2 to 10 p.m.). Mr. Carter replied that the previous day's e-mail from Mr. Vaughan had said night shift, 10 p.m. to 6 a.m., and that if Vaughan had asked him to work 2-to-10 he would have said yes.

129. Mr. Vaughan's reply was, "And why didn't you pick up the on-call phone on Tuesday?" Mr. Carter answered that the on-call week starts Wednesday, according to the schedule the office established before the furlough.

130. Mr. Vaughan then softened, saying that Mr. Allen was gone—he had recently retired—and said he hoped he and Mr. Carter could have a better relationship. He said he would "like us to get back on a better page" where we "understood each other."

131. Mr. Carter pointed out that the mistreatment he was suffering was not coming only from Mr. Allen, that Mr. Vaughan could have stopped it, but that he, Carter, was ready to

work as always. Mr. Vaughan said, "That's all I can ask." Mr. Carter then simply asked what Mr. Vaughan needed him to handle that day.

132.     Shortly thereafter, Mr. Carter was surprised to receive an e-mail from Mr. Vaughan saying he was being suspended from work for five days due to the December 2018 incident referred to in Paragraphs 99-101 above. Mr. Carter learned only later, in February 2019, what the purported reason for the suspension was.

133.     Months after Mr. Allen retired, Dana Friend told Mr. Carter that he had in his files a letter from Mr. Allen complaining that Mr. Carter had somehow threatened him or behaved aggressively toward him. Mr. Friend falsely claimed he had shown Mr. Carter this letter in March 2018, prior to his two-day suspension, and said that this letter had been used to justify that suspension. Mr. Friend never showed Mr. Carter that letter, and Mr. Carter has never seen it.

134.     Mr. Friend knew or should reasonably have known that the letter from Mr. Allen was unworthy of belief and was motivated by Mr. Allen's bias against Mr. Carter based on sexual orientation and gender identity and expression. Mr. Friend should never have accepted the letter as evidence of behavior by Mr. Carter warranting disciplinary action of any kind.

135.     On Saturday, April 6, 2019, Mr. Carter arrived at work at or before 6 a.m. to work an 8-hour weekend overtime shift until 2 p.m. By this time, Mr. Carter was regularly working Saturdays as overtime hours.

136.     Mr. Carter entered the building maintenance office in the D.C. Courts' "A" Building sometime before 12 noon, together with co-worker Calvin Bellamy. A little after noon, co-workers Jeffrey Hawkins and Erwin Hicks came in and sat with Mr. Carter and Mr. Bellamy at the table. Neither Robert Jones nor Elnardo Hicks was present.

137.    About five minutes later, Mr. Vaughan entered the room. He saw the four workers seated around the table, and said, "Is this a party? Why wasn't I invited?" or words to that effect.

138.    Mr. Hawkins responded that he and the other three had been working all morning. He said he would show Mr. Vaughan work that had been done, and he left the room briefly with Mr. Vaughan.

139.    When Mr. Vaughan and Mr. Hawkins returned shortly thereafter, Mr. Bellamy, Erwin Hicks and Mr. Carter were still there. Mr. Vaughan came straight to Mr. Carter and said, "Go home." He also said he and Mr. Carter would talk on the coming Monday. He then turned and immediately left the room without another word. He did not pause to look around the room.

140.    On or about Monday, April 8, 2019, Mr. Carter awoke sometime after 5 a.m. and discovered a text message from Mr. Vaughan instructing him not to come to work, and saying he had been placed on paid administrative leave until further notice.

141.    Mr. Carter subsequently learned that Mr. Vaughan claimed he saw an open beer can on the table in Mr. Carter's "vicinity" in the "A" Building maintenance office when he entered it during the 12 o'clock hour on Saturday, April 6.

142.    Any such claim is untrue. Mr. Carter was in the room, with no open alcoholic beverage container, from before Mr. Vaughan entered the room the first time until after he left the second time.

143.    The entire time Mr. Carter was in the room, no alcoholic beverage was opened or consumed, by Mr. Carter or by anyone else. Mr. Carter smelled no alcohol in the room or on the breath or the person of anyone in the room. He saw no behavior by anyone in the room

that suggested the slightest inebriation. His personal observation was that everyone in the room appeared completely sober and not under the slightest influence of alcohol.

144.   Mr. Carter subsequently learned that Mr. Vaughan claimed that when he saw the supposed open can of beer mentioned above, he "immediately spoke to the other staff members" about it. Mr. Carter saw personally that on that day Mr. Vaughan did not speak to any of the four co-workers mentioned above, about alcohol or anything else, before or after he ordered Mr. Carter to go home.

145.   Several weeks later, on May 2, 2019, without ever having permitted Mr. Carter to return to work, Mr. Vaughan transmitted to Mr. Friend a memorandum ("Vaughan memo") recommending that Mr. Carter's employment be terminated. Mr. Friend upheld that recommendation in a memorandum dated May 22, 2019, to D.C. Courts deputy executive officer Herbert Rouson. Mr. Rouson approved that recommendation in a memorandum dated June 12, 2019 ("Rouson memo"), which Mr. Friend conveyed to Mr. Carter in a memo dated June 13, 2019 ("termination memo"), telling him that he was being dismissed.

146.   On information and belief, Mr. Rouson's approval memorandum was itself approved by Dr. Bailey, the D.C. Courts system's highest-ranking staff official, and as such was the decision and act of the Courts system's final policymaker.

147.   The Rouson memo stated, as did the original Vaughan memo on which it was based, that Mr. Carter was dismissed for violating the prohibition in D.C. Courts personnel policy, known as Policy 800, on drinking alcohol or being "adversely impaired" by alcohol on Court premises. That allegation is factually untrue: Mr. Carter neither consumed nor was under the influence of alcohol while on site.

148.   The termination memo referred to Mr. Carter's "supervisor [Mr. Vaughan]'s observation of [him] with an open container of alcohol and a pack of beer in [his] close vicinity

while on duty" in Building "B" (in fact the workers were in Building "A") at around 12:40 p.m. on Saturday, April 6, 2019. This statement is factually untrue: there was no open container of beer in the room when Mr. Vaughan claimed he saw one.

149.   The termination memo also said that Mr. Vaughan claimed he "immediately spoke to the other staff members and two of them confirmed that they witnessed Mr. Carter drinking beer in the office in said office earlier on the same day." That assertion, too, is factually untrue. Erwin Hicks and Jeffrey Hawkins were in the room when Mr. Vaughan entered, and saw no such thing, nor did Mr. Vaughn speak with them. Calvin Bellamy and Clyde Elder were also there, likewise saw no such thing, and similarly never spoke with or were spoken to by Mr. Vaughan.

150.   Mr. Vaughan solicited unsworn one-sentence e-mails from Robert Jones and Elnardo Hicks, weeks after that day, inculpating Mr. Carter. Mr. Vaughan induced these e-mail statements by promising both men promotions, pay raises and/or other job benefits. Neither Mr. Jones nor Elnardo Hicks was in the room alone with Mr. Carter that day, meaning that also in the room at any such time was one or more of the three others whose sworn declarations directly contradict the unsworn messages from Jones and Hicks.

151.   The Rouson memo wrote that Mr. Vaughan said Mr. Carter had "admitted" that he had a beer "on the way to work" that Saturday morning, and that "to [Vaughan]" this was an admission that Carter was under the influence on the job.

152.   In fact Mr. Carter was not inebriated on the job, and did not "admit" any such thing to Mr. Vaughan or anyone else.

153.   Mr. Vaughan's after-the-fact allegation of inebriation is inherently speculative, unsupported by real evidence, and patently unacceptable as a basis for any sound determination of such an important fact. Mr. Vaughan could have, but did not, order a breath

test or other accepted measure of intoxication at the time, even though the courthouse had medical personnel on duty at the time. He did not do these things because he knew that any objective measure would show that Mr. Carter was not intoxicated.

154. Mr. Rouson's June 12 memorandum mentioned unspecified "disciplinary history" involving Mr. Carter. Although Mr. Carter has never been apprised of what "discipline" Mr. Rouson meant, or what significance he assigned to it in his memorandum, Mr. Carter supposes that the Rouson memorandum was referring to two incidents: the two-day suspension unfairly imposed by Mr. Vaughan in April 2018 after Mr. Carter complained of transgender-based bullying by him and Mr. Allen, and the other in December 2018, which the memo said was still "under review," for alleged insubordination concerning the light bulbs in the courthouse detention facility.

155. Both of these instances of "discipline" were unjustified on any legitimate ground, and were imposed on Mr. Carter as a pretext for illicit bias against him on account of his sexual orientation and/or gender identity and expression, and as retaliation for complaining to superiors about his mistreatment on these illicit grounds.

156. Mr. Carter's termination was unjustified on any legitimate ground, and was imposed as a pretext for unlawful discrimination on account of Mr. Carter's sexual orientation and/or gender identity and expression, and in retaliation for his complaining to his superiors about his illicit mistreatment on these grounds.

157. Mr. Allen's "black shoe is a black shoe" remark, and his frequent "he-she" abuses, including his stated wish to "get [Mr. Carter's] he-she a** fired," in addition to his repeated derisive, demeaning and degrading singling out of Mr. Carter for on-the-job mistreatment and false allegations of work rule infractions, show the true and ugly colors of his discriminatory and retaliatory animus against Mr. Carter based on sexual orientation and gender identity and

expression, and because of his complaining to his superiors about mistreatment on these grounds.

158. Mr. Vaughan's condonation of the abuse by Mr. Allen, which often occurred in his presence; his repeated and derisive singling out of Mr. Carter for on-the-job mistreatment; and his trumping-up of petty and outright false charges as a pretext to accomplish Mr. Carter's firing, were all motivated by discriminatory and retaliatory animus against Mr. Carter based on sexual orientation and gender identity and expression, and because of his complaining to his superiors about mistreatment on these grounds.

159. Mr. Friend had actual knowledge of the pattern of bias-based mistreatment of Mr. Carter, but chose to do nothing to stop or redress it, and instead approved of the unjustified and bias-based discipline and termination of Mr. Carter based on his own discriminatory animus against Mr. Carter on account of sexual orientation and gender identity and expression, his desire to appease others' discriminatory animus against Mr. Carter on those grounds, or both.

160. Mr. Friend knew or should have known that the memorandum from Mr. Vaughan was a pretext for discriminatory animus against Mr. Carter as alleged in this Complaint, and should have performed his own investigation of the facts rather than rely on subordinate managers whose freedom from bias he had or should have had reason to doubt. Had he fulfilled his obligation to investigate independently, he would have learned that neither discipline nor termination of Mr. Carter was warranted. In failing to perform his own investigation, Mr. Friend allowed the bias-based adverse treatment of Mr. Carter to proceed undeservedly to the ultimate sanction, participated in that adverse treatment, and thus violated Mr. Carter's federally protected rights himself.

161.   Mr. Rouson knew or should have known that the memoranda from Mr. Vaughan and Mr. Friend were a pretext for discriminatory animus against Mr. Carter as alleged in this Complaint, and should have performed his own investigation of the facts rather than rely on subordinate managers whose freedom from bias he had or should have had reason to doubt. Had he fulfilled his obligation to investigate independently, he would have learned that neither discipline nor termination of Mr. Carter was warranted. In failing to perform his own investigation, Mr. Rouson allowed the bias-based adverse treatment of Mr. Carter to proceed undeservedly to the ultimate sanction, participated in that adverse treatment, and thus violated Mr. Carter's federally protected rights himself.

162.   Dr. Bailey knew or should have known that the memoranda from Mr. Vaughan, Mr. Friend and Mr. Rouson were a pretext for discriminatory animus against Mr. Carter as alleged in this Complaint, and should have performed her own investigation of the facts rather than rely on subordinate managers whose freedom from bias she had or should have had reason to doubt.  Had she fulfilled her obligation to investigate independently, she would have learned that neither discipline nor termination of Mr. Carter was warranted. In failing to perform her own investigation Dr. Bailey allowed the bias-based adverse treatment of Mr. Carter to proceed undeservedly to the ultimate sanction, participated in that adverse treatment, and thus violated Mr. Carter's federally protected rights herself.

163.   Moreover, Dr. Bailey was the ultimate source for her subordinates' misguided belief that Mr. Carter's gender transition treatments could be held responsible for whatever bias-based dislike they had of him. Moreover, because Dr. Bailey (a) was the D.C. Courts system's executive director, and as such the operating chief of the Courts as an agency and its final decisionmaker in personnel matters, and (b) clothed her benighted suppositions with an air of clinical as well as bureaucratic authority, her pronouncements constituted D.C. Courts policy

and induced her subordinates to follow it. In enacting and implementing her own discriminatory policy decision alleged herein that Mr. Carter's gender transition made him a problem employee, she caused the D.C. Courts as an agency to violate Mr. Carter's federally protected rights itself.

164.   Following his termination as alleged herein, Mr. Carter made serious and sustained efforts to look for other employment, applying to dozens of full-time positions in his field, but from his D.C. Courts termination until the date of this filing has been able to secure only short-term, intermittent work at dramatically reduced pay, ranging from 25% to over 50% less than he was paid by the D.C. Courts.

165.   As a result of his loss of livelihood, and his extended periods of un- and under-employment since his termination by the D.C. Courts, Mr. Carter has been forced to deplete his retirement savings completely even though he is fifteen years or more away from retirement age.

166.   Because of his lack of financial resources, Mr. Carter has now been forced to live in Tennessee with his daughter, and is being supported by her and her spouse. He has been able to find intermittent short-term employment there, but has been unable to explain his departure from employment with the D.C. Courts to the satisfaction of potential employers and has been rejected numerous times for hire.

167.   At the time of Mr. Carter's termination as alleged herein, his ongoing transition-related medical treatment was too complex to be interrupted or switched to another health care provider. This reality required him to continue with Kaiser Permanente, his health insurer and health care provider while he worked at the D.C. Courts, but only by paying the entire premium of over $700 a month, almost a 1,000% increase over his former payments of $36 every two weeks, because his subsequent employment either carried no health benefits or

did not offer Kaiser coverage to employees. Kaiser permitted deferral of premium payments for a time during the global coronavirus pandemic, but eventually dropped Mr. Carter as an insured for nonpayment.

168.    As a result, Mr. Carter has been completely without access to health care for the past year, which has caused, is causing, and will continue to cause injury to his health given his special medical needs. For want of the necessary funds, he was unable to keep his medically required one-year post-surgery follow-up appointment. In the past year he has had no blood testing, no monitoring of his hormone levels, and none of the hormone prescriptions he must receive for the rest of his life in order to maintain the physical soundness of his transition. Further, he has been unable to find a physician accessible to him in rural northwest Tennessee, where he was forced to relocate, who could make and supervise such treatment. The result has been a substantial and ongoing threat to his health and quality of life independent of and additional to the emotional harms complained of elsewhere in this Complaint.

169.    Mr. Carter has also been unable to access the continuing mental health counseling and treatment that is an integral part of his gender transition even after surgery. Without this treatment, and without meaningful employment, Mr. Carter's emotional condition has suffered greatly.

170.    The abuse Mr. Carter suffered at the D.C. Courts, culminating in the pretextual "discipline," termination, and involuntary unemployment described above—after nine years of hard work for this employer, and patience with the abuse its personnel inflicted on him— was devastating to him as a person and as a professional, and caused him severe and lasting emotional damage as detailed in each Count below.

171.    Since Mr. Carter's firing by the D.C. Courts, his professional and personal life has been much more difficult than before his ordeal there began. He will never be the same. He has experienced depression, a want of resiliency, a decline in trust of co-workers and superiors, a decline in patience with the controlling and arbitrary behavior of supervisors, heightened anxiety that he is being disparaged and discriminated against, greater fatigue, a decline in enjoyment of his work and his leisure time, and overall a major loss of quality of life directly attributable to the mistreatment he suffered at the D.C. Courts.

172.    As a result of the torment and heartache inflicted on him by his employer's wrongs as alleged herein, Mr. Carter has suffered the loss of his marriage to his spouse—even though she was and remains supportive of his transition—because she found the economic and emotional burdens of his mistreatment and loss of livelihood unsustainable.

### Count I:
*Discrimination by Courts managers*
*based on sexual orientation and gender identity and expression*
*in violation of the federal Constitution*

173.    All previous paragraphs of this Complaint are incorporated herein as if set forth in their entirety.

174.    As an employee of the D.C. Courts, Mr. Carter is entitled to all the rights and remedies, including judicial remedies, afforded to public employees under the federal Constitution, including rights against all forms of discrimination in the workplace based, *inter alia*, on sexual orientation and gender identity and expression.

175.    After *United States v. Windsor*, 570 U.S. 744 (2013), and *Obergefell v. Hodges*, 576 U.S. 644 (2015), and therefore by the time of the mistreatment and wrongful termination described in this Complaint, the right to equal treatment by governmental actors regardless of sexual orientation, and the right against imposition of special disabilities by such actors on that basis,

were clearly established as protected for public employees in the District of Columbia by the equal protection and due process guarantees of the Fifth Amendment to the federal Constitution.

176.    Mr. Carter's employer violated those clearly established rights by mistreating him as described in this Complaint, including but not limited to the bullying, the constant stream of disparagements and insults, the denial of overtime, the arbitrary and punitive shift changes, the false and bigoted insistence that his hormone treatments were causing behavior problems, the two unjustified suspensions from work, and the termination to which they led, as described above, all motivated by a discriminatory animus against him based on his sexual orientation when presenting as female, and on his gender identity and expression when transitioning from female to male, and was condoned, ignored and tolerated by D.C. Courts higher management. As such, the series of mistreatments described herein constituted disparate and discriminatory treatment based on sexual orientation, gender identity and expression in violation of Mr. Carter's federally protected rights.

177.    These acts and omissions caused Mr. Carter loss of employment, loss of pay and other benefits of employment, as well as anguish, intense hurt, humiliation, anger, sense of loss, disappointment, and emotional conflict between his desire for professional excellence and the torment inflicted on him merely for showing up every day, working, and working well, as a lesbian and then as a transgender person.

178.    The acts of Mr. Carter's superiors alleged in this Complaint were motivated by actual malice and/or evil intent, and were done with the intention to cause Mr. Carter pain, humiliation, anguish and torment, and as such warrant the imposition of punitive damages.

**Count II:**

*Hostile work environment created by Courts managers*
*based on sexual orientation and gender identity and expression*
*in violation of the federal Constitution*

179.   All previous paragraphs of this Complaint are incorporated herein as if set forth in their entirety.

180.   The constant stream of abuse, insult, invective, mockery, and demeaning and unjustified disparagements directed at Mr. Carter, together with the denial of overtime, the sudden, arbitrary and punitive shift changes, the two unjustified suspension from work, and the termination to which they led, as described in this Complaint, all motivated by a discriminatory animus against Mr. Carter on account of his sexual orientation when presenting as female, and his gender identity and expression when transitioning from female to male, and all condoned, ignored and tolerated by D.C. Courts higher management, was so severe and pervasive that it materially changed the terms and conditions of Mr. Carter's employment and made that employment intolerable to a reasonable person.

181.   The conduct of Mr. Carter's superiors described in this Complaint was such that a reasonable employee would find it intolerably offensive.

182.   Mr. Carter subjectively experienced the demeaning, hostile, and degrading conduct of his superiors alleged herein to be objectively offensive.

183.   Mr. Carter's harassers knew, should have known, and/or had reason to know the conduct was intolerably offensive to any reasonable person in Mr. Carter's circumstances, and so did their superiors in the D.C. Courts' higher management, who knew or should have known of the conduct, and of its severity, pervasiveness, duration, and intolerability; knew or should have known that Mr. Carter's right against it based on his sexual orientation and

gender identity and expression was clearly established; and knew or should have known not to tolerate, ignore, condone or license it as they did.

184.   The fact that Mr. Carter bravely persevered and continued to perform his job, throughout and despite the abuses alleged in this Complaint, until he was unfairly discharged, does not establish that the cited conditions were tolerable to a reasonable person.

185.   The conduct of Mr. Carter's superiors described in this Complaint, of which the most recent was the termination of his employment on June 13, 2019, constituted a continuing course of harassment and hostile work environment based on sexual orientation and gender identity and expression from which Mr. Carter is protected by the federal Constitution.

186.   After *United States v. Windsor*, 570 U.S. 744 (2013), and *Obergefell v. Hodges*, 576 U.S. 644 (2015), and therefore by the time of the mistreatment and wrongful termination described in this Complaint, the right to equal treatment by governmental actors regardless of sexual orientation, and the right against imposition of special disabilities by such actors on that basis, were clearly established as protected for public employees in the District of Columbia by the equal protection and due process guarantees of the Fifth Amendment to the federal Constitution.

187.   The acts and omissions complained of in this Complaint caused Mr. Carter loss of employment, loss of pay and other benefits of employment, as well as anguish, intense hurt, humiliation, anger, sense of loss, disappointment, and emotional conflict between his desire for professional excellence and the torment inflicted on him merely for showing up every day, working, and working well, as a lesbian and as a transgender person.

188.   The acts of one or more of Mr. Carter's superiors alleged in this Complaint were motivated by actual malice, and were done with the intention to cause Mr. Carter pain, humiliation, anguish and torment, and as such warrant the imposition of punitive damages.

**Count III:**

*Retaliation by Courts managers for protected opposition activity*

189.   All previous paragraphs of this Complaint are incorporated herein as if set forth in their entirety.

190.   The punitive response of Mr. Allen to Mr. Carter's complaints about him to his superiors, including but not limited to verbal threats not to complain about him, together with the workplace abuses directed against Mr. Carter by Mr. Allen and Mr. Vaughan, including but not limited to the bullying, the constant stream of disparagements and insults, the denial of overtime, the arbitrary and punitive shift changes, the false and bigoted insistence that his hormone treatments were causing behavior problems, the two unjustified suspensions from work, and the termination to which they led, as described above, all motivated by a retaliatory animus against him on account of his sexual orientation when presenting as female, and his gender identity and expression when transitioning from female to male, constituted retaliation against Mr. Carter for complaining about the two men to their superiors, in violation of his federally protected right against such retaliation.

191.   The toleration and condonation of these adverse acts by D.C. Courts higher management, including but not limited to Mr. Friend, Ms. Satterthwaite, Mr. Rouson, Ms. Wicks, and above all Dr. Bailey, all of whom either had discriminatory animus against Mr. Carter themselves, or  personal knowledge of Mr. Allen's and Mr. Vaughan's discriminatory animus against Mr. Carter or, if without such personal knowledge, were induced by Mr. Allen and/or Mr. Vaughn to regard Mr. Carter without justification as unsuitable for continued employment, enabled and compounded those acts in violation of Mr. Carter's federally protected right against retaliation in governmental employment based on sexual orientation and gender identity.

192.    The adverse acts and omissions of Mr. Carter's superiors described in this Complaint caused Mr. Carter loss of employment, loss of pay and other benefits of employment, as well as anguish, intense hurt, humiliation, anger, sense of loss, disappointment, and emotional conflict between his desire for professional excellence and the torment inflicted on him merely for showing up every day, working, and working well, as a lesbian and as a transgender person.

193.    The acts of one or more of Mr. Carter's superiors alleged in this Complaint were motivated by actual malice and/or malign intent, and were done with the intention to cause Mr. Carter pain, humiliation, anguish and torment, and as such warrant the imposition of punitive damages.

**Count IV:**
*Liability of the D.C. Courts as an agency under* **Monell**

194.    All previous paragraphs of this Complaint are incorporated herein as if set forth in their entirety.

195.    Dr. Cheryl Bailey is, and was at all times relevant hereto, the D.C. Courts system's acting executive officer. As such, she is the operating chief of the Courts as an agency, and its final decisionmaker and policy-making authority in personnel matters. Her acts, decisions and pronouncements constitute D.C. Courts policy.

196.    Dr. Bailey has ultimate authority to, and did, promulgate and implement within D.C. Courts management her false and bigoted presumptions about female-to-male gender transition, and in particular the supposition, not only not based in science but contrary to it, that Mr. Carter's hormone treatments must be causing, and that therefore he must be exhibiting, whether observed or not, "outbursts" and "uncontrollable behavior."

197.    Dr. Bailey clothed her benighted suppositions with an air of clinical as well as bureaucratic authority, and induced her subordinates to follow them.

198. She announced those suppositions and presumptions to Mr. Carter in her bizarre, medically unfounded, transphobia-laden March 2018 statements to him referred to in Paragraph 80 above.

199. She transmitted her false, bias-based beliefs to her subordinate D.C. Courts managers, including Mr. Friend, as shown in his actions described in Paragraphs 87 and 94 above, and Ms. Satterthwaite, as shown in her actions described in Paragraph 89 above.

200. In conceiving, promulgating and transmitting these false, bias-based beliefs, Dr. Bailey enacted and implemented those beliefs as the policy of the D.C. Courts.

201. The policy thus implemented and enacted violated Mr. Carter's federally protected right to be free from discrimination based on gender identity and expression, a right clearly established after *United States v. Windsor*, 570 U.S. 744 (2013), and *Obergefell v. Hodges*, 576 U.S. 644 (2015).

202. This bias-based policy, ultimately originating in the discriminatory animus of Dr. Bailey as alleged herein, effectively authorized and licensed similar attitudes in her subordinate D.C. Courts system managers who supervised Mr. Carter, including Mr. Allen, Mr. Vaughan, Mr. Friend and Mr. Rouson, and led directly to the official acts of D.C. Courts management alleged in this Complaint that singled out Mr. Carter for maltreatment, up to and including the discriminatory termination of his employment on a false and scurrilous pretext.

### *Prayer for relief*

WHEREFORE, Mr. Carter respectfully prays for the following relief:

1. A declaration that his termination, and the abuse of him that preceded it, were motivated by his superiors' discriminatory animus on account of his sexual orientation and

his gender identity and expression in violation of his federally protected rights, and were retaliation for his complaining of mistreatment violative of those rights.

2.  An award of Mr. Carter's fully appropriate back wages and benefits for all periods when he was either out of work or underemployed from June 14, 2019, until the date of judgment in this action.

3.  A "front pay" award of the difference between what Mr. Carter would have earned during five full years following his termination from the D.C. Courts and what he has been and will be able to earn over the same five full years, as will be proven at trial.

4.  An award of monetary damages sufficient to compensate Mr. Carter for the past, present and future emotional harms caused by the years of humiliation and degradation he endured at the hands of his superiors while working at and for the D.C. Courts.

5.  An award of appropriate punitive damages for the actual malice and cruelty shown by Mr. Carter's D.C. courts superiors, and adopted or condoned by the D.C. Courts as Mr. Carter's employer, to the point of unlawfully terminating him on a false, scurrilous and outrageous pretext based on that malice and cruelty.

6.  Mr. Carter's costs of suit, including reasonable attorneys' fees.

7.  Any other and further injunctive and monetary relief that this Court deems just and proper.

### *Jury demand*

A jury trial is demanded on all claims in this Complaint.

Respectfully submitted,

_____
Stephen B. Pershing
D.C. Bar No. 482580
Pershing Law PLLC
1416 E Street, N.E.
Washington, D.C. 20002
(202) 642-1431 (o/m)
steve@pershinglaw.us

*Counsel for plaintiff*

Dated: June 12, 2022