IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DION CARTER,

       Plaintiff,

                              Civil Action No. 1:22-cv-01681

v.

                              Hon. Dabney L. Friedrich

DISTRICT OF COLUMBIA,
*et al.,*

       Defendants.


MEMORANDUM IN OPPOSITION
TO DISTRICT'S AND INDIVIDUAL DEFENDANTS' MOTIONS
<u>TO DISMISS AMENDED COMPLAINT</u>


I.      <u>Introduction</u>

This opposition explains why, at the pleading stage, neither the District of Columbia

under theories of municipal liability, nor the individual defendants named in plaintiff Dion

Carter's First Amended Complaint, should be dismissed from this suit.

II.     <u>Discussion</u>

      A.  *Monell* liability has been plausibly alleged

The District's boilerplate discussion of municipal liability under *Monell v. N.Y.C.*

*Dept. of Social Services,* 436 U.S. 658, 691 (1978), *see* District's Dismissal Memorandum (ECF

No. 15) does not seriously contend that Mr. Carter's Amended Complaint alleges only a

*respondeat superior* theory of liability against the D.C. Courts' chief executive, Dr. Cheryl Bailey. True, Mr. Carter alleges that the D.C. Courts' decision to terminate him as a building maintenance technician was based on a fabricated pretext for unlawfully discriminatory suppositions about his gender transition. Complaint (ECF No. 1), ¶¶ 1, 107, 157-163, 176, 180, 190-191, 202; Amended Complaint (ECF No. 9-2), ¶¶ 1, 6-10, 163-68, 186, 190, 200-201. But he also alleges that the decision to fire him was taken at the policymaking level of the D.C. Courts, specifically by Dr. Bailey as executive officer and agency head, the individual with ultimate policy-making authority over non-judicial personnel matters at the Courts—and was the direct result *of Dr. Bailey's own bias*. Amended Complaint, ¶¶ 1, 9, 42, 47, 88-91, 96-98, 107, 152, 168-169.

In particular, Mr. Carter alleges, first, that Dr. Bailey knew in detail about the bias-based mistreatment of Mr. Carter by his first supervisor, Emanuel Allen, and never sought to have him disciplined, indicating she did not believe that his conduct—again, of which she knew in detail—warranted any sanction. Amended Complaint, ¶ 47. He then alleges, Amended Complaint ¶ 42, that Dr. Bailey was present at a June 2016 "awareness meeting"—presumably because she believed that the matter had risen to her level of responsibility by then—at which Mr. Carter's mistreatment at his supervisors' hands was openly discussed, and which moved another senior Courts official, Anne Wicks, to invite Mr. Carter to meet with

her personally, and to acknowledge at that later meeting the unacceptability of his supervisors' bullying, insulting behavior. *Id.*[1]

Mr. Carter further alleges that he sought a meeting with Dr. Bailey in March 2018, after further mistreatment at the hands of his later supervisor, individual defendant James Vaughn,[2] and that instead of addressing his complaint, she "almost immediately changed the subject . . . , said she was 'a licensed therapist,' and asked if she could ask him 'a few questions.'" Amended Complaint ¶ 88. "She then inquired . . . about the hormone treatments Mr. Carter was receiving for his transition, and then opined that because he was taking testosterone he was having 'outbursts' and exhibiting 'uncontrollable behavior.'" *Id.* Mr. Carter "objected that this was not the case, that Dr. Bailey could review internal security videos to see for herself that he had engaged in no 'outbursts' or 'uncontrollable behavior' . . . Dr. Bailey refused to address Mr. Carter's factual averments concerning the supposed AWOL and ended the meeting." Amended Complaint ¶ 89. "In [these] assertions and actions . . ., Dr. Bailey acted on her own motive to discriminate against Mr. Carter based on his sexual orientation and gender identity and expression." Amended Complaint ¶ 90.

"Mr. Carter found Dr. Bailey's presumptions about his medical treatment to be unfounded, bizarre, demeaning and insulting. He found her attitude shockingly bigoted,

---

[1] This mention of Ms. Wicks does not condone her own apparent failure to discipline Mr. Allen, Amended Complaint ¶ 47, but is cited here to distinguish her views and motivations from the dramatically different, victim-blaming response of Dr. Bailey described *infra*.

[2] Mr. Carter accepts the District's spelling of Mr. Vaughn's surname. Any instances of the spelling "Vaughan" in the Amended Complaint or elsewhere in Mr. Carter's papers refer to this same individual.

particularly for a 'licensed therapist' as she had claimed to be, and especially given the

scientific consensus that testosterone in the small amounts administered to aid female-to-male

gender transitions was nowhere near enough to cause adverse behavioral changes." Amended

Complaint ¶ 91.

Next, Mr. Carter alleges that, still in March 2018, D.C. Courts manager Dana Friend

summoned him to a private meeting where he "parroted, almost verbatim," the baseless,

bigoted language about his testosterone treatments causing "outbursts" or "uncontrollable

behavior" with which Dr. Bailey had insulted him shortly before, again in the absence of any

behavior by Mr. Carter which could legitimately have been so characterized. Amended

Complaint ¶ 96.

Mr. Carter alleges that "the immediate source of Mr. Friend's baseless, prejudiced

pronouncement about testosterone was Dr. Bailey, and that she had transmitted her false

presumptions, based on bigotry and not science, to Mr. Friend . . . in such a manner as to

direct Mr. Friend to adopt those suppositions as D.C. Courts policy applied to Mr. Carter."

Amended Complaint ¶¶ 97-98.

Based on these facts, Mr. Carter then alleges that Mr. Friend's insistence that he see a

therapist as a condition of returning to work, Amended Complaint ¶ 106, was the product of

his and Dr. Bailey's "motive to discriminate against Mr. Carter based on his sexual orientation

and gender identity and expression"; that the e-mail to Mr. Carter conveying this insistence,

"and its implicit allegation that Mr. Carter had mental problems[, were] directly sourced in

Dr. Bailey's false and bigoted presumptions about female-to-male gender transition and her

bogus suppositions, not only not based in science but contrary to it, [and] that Mr. Carter's hormone treatments must be causing, and that therefore he must be exhibiting, whether observed or not, "outbursts" and "uncontrollable behavior." Amended Complaint ¶¶ 106-107.

Mr. Carter also alleges that Dr. Bailey knew or should have known that the memoranda from Mr. Vaughan, Mr. Friend and Mr. Rouson were unworthy of belief based on those managers' demonstrated animus toward Mr. Carter's gender transition, and that she "should have performed her own investigation of the facts rather than rely on subordinate managers whose freedom from bias she had or should have had reason to doubt. Had she fulfilled her obligation to investigate independently, she would have learned that neither discipline nor termination of Mr. Carter was warranted. In failing to perform her own investigation Dr. Bailey allowed the bias-based adverse treatment of Mr. Carter to proceed undeservedly to the ultimate sanction, participated in that adverse treatment, and thus violated Mr. Carter's federally protected rights herself." Amended Complaint ¶ 168.

If these facts are true—and they must be taken as true under current pleading standards, *see Momenian v. Davidson,* 878 F.3d 381, 384-385 (D.C. Cir. 2017) (factual allegations of complaint are "assumed true for the purpose of reviewing Defendant's motion to dismiss")*, citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)—then they show Dr. Bailey's benighted view of gender transitions and the transgender experience, and validly allege that her decision to terminate Mr. Carter's employment was based on transphobic presuppositions that are very definition of bias. *See* Webster's Unabridged Dictionary (2012

ed.), at 202 (defining "bias" as "a particular tendency or inclination, esp[ecially] one that prevents unprejudiced consideration of a question; prejudice").

Because Dr. Bailey was the agency head as alleged in the Amended Complaint, it follows that the District, as stand-in for the D.C. Courts,[3] is liable for Dr. Bailey's termination decision—alleged in the Amended Complaint to have been bias-based—under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978) (liability can be visited on "those whose edicts or acts may fairly be said to represent official policy"). *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986) (discussing "final policymaking authority"); St. *Louis v. Praprotnik*, 485 U.S. 112, 125 (1988) (municipal liability can attach to a single act of the "official [who] has the responsibility for . . . setting policy in any given area of a local government's business"); *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) ("the action of a policy-maker within the government" can constitute official policy under *Monell*).

*Pembaur* and *Praprotnik* do not create separate categories of policymakers, but are merely separate enunciations of the same principle of municipal policymaker liability. *Pembaur*, 475 U.S. at 481-484; *Praprotnik*, 485 U.S. at 124 ("today we set out again to clarify the issue that we last addressed in *Pembaur*"). *Praprotnik* instructs, in line with *Pembaur*, that the delegation of certain responsibilities within an agency cannot negate municipal liability,

---

[3] The District of Columbia Courts, funded by Congress, are an entity separate from the rest of the D.C. government and beyond its control. The Courts' liability for monetary damages will not be funded by the D.C. government, but they are nevertheless treated as not suable as an independent entity under the reasoning of *Bean v. D.C. Courts*, 930 F. Supp. 2d 93, 95 (D.D.C. 2013) ("the District of Columbia Courts cannot be sued separately from the District of Columbia").

since if it could, the very concept of such liability would be defeated and "Section 1983 could not serve its intended purpose." *Praprotnik*, 485 U.S. at 126; *see also Singletary v. District of Columbia*, 766 F.3d 66, 73 (D.C. Cir. 2014) (noting that policymaking authority derived from state law may be delegated).

Because "the authority to make municipal policy is necessarily the authority to make *final* policy," *id.*, an agency official whose decisions in a particular area are subject to higher review is not the "final" policymaker; the reviewer is. *Thompson v. District of Columbia*, 832 F.3d 339, 348 (D.C. Cir. 2016) (analyzing whether a municipal official reviewed or supervised the alleged "final" decisionmaker's actions); *Vodak v. City of Chicago,* 639 F.3d 738, 747-48 (7th Cir. 2011) (finding that a city official was delegated final policymaking authority when a city council, his reviewing authority, did not use that authority to constrain him). By the same token, if the highest reviewer of decisions in "*that area* of the city's business," *Pembaur*, 475 U.S. at 482-83 (emphasis in original), ratifies or approves an action, that action becomes policy. *Praprotnik*, 485 U.S. at 127; *Thompson*, 832 F.3d at 348; *see also*, e.g., *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) ("the existence of a well-established, officially-adopted policy will not insulate the municipality from liability where a policymaker herself departs from these formal rules").

A showing that a given official's action constituted municipal policy is an independent route to *Monell* liability even for a single executive act, and does not require (a) pleading or proof that lower-level officials' patterns of behavior established a policy or custom, or (b) pleading or proof of such lower-level officials' "deliberate indifference" to whether the application or execution of a facially lawful policy, by definition made by someone else,

nevertheless violated a federally protected right. *Singletary v. District of Columbia*, 800 F. Supp. 2d 58, 64 (D.D.C. 2011), *citing Baker*, 326 F.3d at 1306; *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (any one basis for Section 1983 municipal liability, if adequately pleaded, will withstand a motion to dismiss for failure to state a claim).

At the pleading stage, the Court need determine only whether the plaintiff's *Monell* allegations, considered as a whole, meet the applicable plausibility standard. *Smith v. District of Columbia*, 674 F. Supp. 2d 209, 214, n. 2 (D.D.C. 2009) (sufficiency of a plaintiff's allegations of *Monell* liability must be tested under the standards set out in *[Ashcroft v.] Iqbal* [, 556 U.S. 662, 678-79 (2009),] and *[Bell Atlantic v.] Twombly*[, 550 U.S. 544, 555 (2007)]).”

Mr. Carter's Amended Complaint makes concrete allegations that the termination decision at issue in this case was that of the D.C. Courts' ultimate policy-maker in non-judicial personnel matters, Dr. Bailey, and that her own personal bias was at work in the decision. There was no one above Dr. Bailey at the Courts. Amended Complaint, ¶¶ 9, 205. The only persons on an organizational par with her were the judges of the D.C. Courts, the other members of the Courts system's Joint Committee on Judicial Administration, and they do not participate in or review Dr. Bailey's acts, pronouncements or decisions on non-judicial personnel matters. Thus, her actions in making and implementing a decision in such matters, or in directing, authorizing, ratifying or approving that decision, constitute D.C. Courts policy and are acts of the municipality under *Monell*, such that claims against Dr. Bailey in her official capacity would be redundant of claims against the municipality. *Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996) (“A [S]ection 1983 suit for damages against

municipal officials in their official capacities is . . . equivalent to a suit against the municipality itself").

A ruling at the pleading stage that Dr. Bailey's termination decision was not that of the agency would fly in the face of these precedents, and would ignore the validly alleged, indeed apparently undisputed, facts of Dr. Bailey's role. At the same time, a dismissal of Mr. Carter's allegations about Dr. Bailey as insufficiently "plausible" under *Twombly*, 550 U.S. at 555, would effectively decide, as a matter of law, that she could not possibly have had the anti-transgender bias Mr. Carter has alleged from her statements and actions. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 555 ("factual allegations" of complaint must be assumed true even if "doubtful in fact").

The question of discriminatory motivation, once pleaded past the merely "speculative," *Twombly*, 550 U.S. at 555, is an inherently factual one that only the finder of fact can decide, based on proofs that have yet to be developed. *Jouanny v. Embassy of France*, No. 1:16-cv-00135, at *14 (D.D.C. June 5, 2017) ("Whether an employer's actions were motivated by discriminatory animus or a valid non-discriminatory reason is a quintessential question of fact that cannot readily be resolved on a motion to dismiss."), *citing Williams v. Shinseki*, 161 F. Supp. 3d 77, 80 (D.D.C. 2011). The Court should resist whatever temptation this case may pose to substitute its own factual assessment of Dr. Bailey's motives for the judicial process to which we all pledge allegiance.

### B.  The Amended Complaint's allegations against individual defendants relate back to the timely-filed original Complaint

The District contends, Individual Defendants' Dismissal Memorandum (ECF No. 16) at 4-5, that Mr. Carter is out of time to name as defendants the individuals, mentioned explicitly and repeatedly in his original Complaint, who he alleges perpetrated the harassment and other bias-based maltreatment at issue in this case. The question is whether the Amended Complaint's allegations against the newly captioned individual defendants relate back to the original pleading. Fed. R. Civ. P. 15(c)(1)(B) ("an amendment to a pleading . . . relates back if [it] asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading"); Fed. R. Civ. P. 15(c)(1)(C) (an amendment that "changes the party or the naming of the party against whom a claim is asserted" relates back if it satisfies the Rule 15(c)(1)(B) same-transaction-or-occurrence requirement and if "the party to be brought in by amendment (i) received such notice of the action that it will not be prejudiced in defending on the merits, and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.").

It strains credulity to suppose that the individuals Mr. Carter now names as personal-capacity defendants would reasonably have had no idea from the original Complaint that his allegations concerned them. Thus Rule 15(c)(1)(C)(i), which focuses on prejudice from lack of meaningful notice, should not be at issue. The individuals in question—Mr. Vaughn, Mr. Friend, Mr. Rouson, and Dr. Bailey—are named as defendants at a very early stage in the litigation, reducing late-entry prejudice to a vanishing minimum, in contrast to cases like

*Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996), in which amendment was sought extremely late in the proceeding.

The crux of the matter is subparagraph (C)(ii), the mistake-of-party-identity situation, which need not be interpreted solely as a "slip of the pen" exception, *see Rendall–Speranza v. Nassim,* 107 F.3d 913, 918 (D.C. Cir. 1997), but should include attempts to meet *Monell* objections by expanding the case caption to persons whose wrongful acts the original pleading described in detail.

This is not a case in which Mr. Carter lacked knowledge of these added defendants' names and roles. *See, e.g., Garrett v. Fleming*, 362 F.3d 692, 696 (10th Cir. 2004) (lack of knowledge of the intended defendant's identity is not a "mistake concerning the identity of the proper party" under the Rule). The undersigned will stipulate that the additional defendants were included in the amended caption to save the case from whatever technical problems the Court might discern under *Monell.* Indeed, the failure to name these defendants as individuals to begin with is arguably a mistake of Section 1983 pleading, which ought to be deemed a "mistake concerning the identity of the proper party" under the Rule. But what it is not is an intentional or strategic omission with the aim of deceiving, prejudicing, or compromising the litigation position of any of the added defendants. Cf. *Harris v. Secretary of Veterans Affairs*, 126 F.3d 339 (D.C. Cir. 1997) ("strategic litigant who intentionally neglected to plead" an affirmative defense should not be rewarded with later permission to amend).

Even the case the District most heavily relies on, *Philogene v. Dist. of Columbia,* 864 F. Supp. 2d 127 (D.D.C. 2012), recognizes that the purpose of subparagraph (C)(ii) is to "avoid the harsh consequences of a mistake that is neither prejudicial nor a surprise to the misnamed

party." *Id.* at 133, *citing Rendall–Speranza,* 107 F.3d at 918. None of the newly named defendants can claim any surprise, or any litigation prejudice, except the possibility that they will be called to account as individuals for their misdeeds. That is not the kind of prejudice from which they can seek the Rules' protection.

### C.  The individual defendants are not entitled to qualified immunity

The District's qualified immunity discussion is notable for what it does not expressly claim: that Mr. Carter's right not to be treated with transphobia-based cruelty was not "clearly established." Dismissal memorandum (ECF No. 16) at 10-11. In fact, the right against this kind of workplace abuse should be understood as established at least since *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78-79 (1998) (Title VII protects against harassment based on sexual orientation). Certainly the right against employment discrimination based on gender identity or expression has been definitively established since *Bostock v. Clayton County,* ___ U.S. ___, 140 S. Ct. 1731 (2020).

Title VII standards apply to Section 1983 private employment cases. *Elam v. Board of Trustees*, 530 F. Supp. 2d 4, 8 (D.D.C. 2007), *citing Singletary v. District of Columbia,* 351 F.3d 519, 529-30 (D.C. Cir. 2003). If this were a Title VII case, the Court would necessarily look to *Bostock* to determine the scope of Title VII discrimination prohibitions. No known reported decision has yet commented on whether *Bostock* should have the same retroactive effect in a Section 1983 case as under Title VII, but *Oncale* should be deemed to satisfy the "clearly established" requirement. Indeed, the concern shown by Ms. Wicks, as described *supra* and alleged in Mr. Carter's Amended Complaint at ¶ 42, suggests that Courts

management knew, or should have known, that even a small part of the defendants' long stream of bias-based mistreatments of Mr. Carter was unacceptable in a civilized society.

Instead of facing this central issue head-on, the District argues, speciously, that in prodding Mr. Carter to admit the falsehood that his transition hormone therapy was causing nonexistent "outbursts," as alleged in ¶¶ 88-92 of the Amended Complaint, Dr. Bailey was making no comment on Mr. Carter's sexual orientation (the memorandum does not even mention gender identity). Memorandum at 10-11.  The same problem infects the Memorandum's discussion, *id.* at 12, of Mr. Friend's allegedly bias-based judgments of Mr. Carter to the same effect. Both of these heavily disparaging comments were most certainly related to Mr. Carter's gender transition. Such a thin justification for the defendants' behavior is telling. However, as the Court well knows, the inferences raised are the province of the factfinder to make, after the facts have been developed, and are not the Court's prerogative at the pleading stage.

As to the District's avowed basis for the termination, the false charge of drinking at work, Mr. Carter alleges in abundant detail that such a charge was false, and describes specifically what really happened. Amended Complaint ¶¶ 141-159. In support of these allegations Mr. Carter submitted to Dr. Bailey, after he was fired, declarations under oath from not one, not two, but three of his co-workers—each of whom, in order to come forward, had to buck their supervisors' obvious determination to destroy Mr. Carter by ruse. Amended Complaint ¶ 156.

It would thus be inappropriate for the Court to substitute its judgment for the factfinder's on these important issues at summary judgment, and it is *a fortiori* inappropriate

to do so on a motion to dismiss. Since the newly named individual defendants' qualified immunity *vel non* cannot be determined without a factual examination of which defendant knew what, and when, concerning the transparently contrived and falsehood-based disciplinary charge that led to Mr. Carter's unjust firing, the pleading stage is, in this particular case, too early to make that decision despite the ordinary applicability of the "immunity from suit" principle. *See Bowser v. Smith,* 401 F. Supp. 3d 122, 126 (D.D.C. 2019) ("Qualified immunity is an immunity from suit rather than a mere defense to liability."), *citing Pearson v. Callahan,* 555 U.S. 223, 237 (2009).

III.   <u>Conclusion</u>

For the foregoing reasons, the District's and the individual defendants' motions to dismiss should be denied.

Respectfully submitted,

_____
Stephen B. Pershing
D.C. Bar No. 482580
Pershing Law PLLC
1416 E Street, N.E.
Washington, D.C. 20002
(202) 642-1431 (o/m)
steve@pershinglaw.us

*Counsel for plaintiff*

Dated: November 18, 2022

^   ^   ^

**CERTIFICATE OF SERVICE**

I certify that on this 18th day of November, 2022, the foregoing was filed with the Court's electronic case filing ("ECF") system, through which it was transmitted to counsel for the District, as follows:

Nicole Marimon, Esq.

Assistant Attorney General

Office of the Attorney General

Civil Litigation Division

400 6th Street, N.W.

Washington, D.C. 20001

nicole.marimon@dc.gov

_____

Stephen B. Pershing